Filed 2/14/22  P. v. Jenkins CA3
Opinion following transfer from Supreme Court

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>      v.<br><br>IRVIN DASHAWN JENKINS,<br><br>      Defendant and Appellant. | C085180<br><br>(Super. Ct. No. 16FE008258)<br><br><br>OPINION ON TRANSFER |

A jury convicted defendant Irvin Dashawn Jenkins of robbery and carjacking stemming from an incident at an oil change shop. Defendant appeals, arguing the trial court erred in excluding expert testimony on the percentage of "false"[1] identifications in cases where the defendant was exonerated by DNA evidence, instructional error, improper exclusion of defendant's statement to sheriff's deputies, prosecutorial misconduct, and ineffective assistance of counsel. Defendant also argues this matter

---

[1] Defendant uses the term false in reference to erroneous identifications.

1

must be remanded to permit the trial court to consider whether it should exercise discretion to strike or dismiss the prior serious felony conviction enhancement imposed under Penal Code section 667, subdivision (a), a discretion afforded by Senate Bill No. 1393 (2017-2018 Reg. Sess.), enacted after defendant's sentencing. He further contends that, due to changes enacted by Senate Bill No. 136 (2019-2020 Reg. Sess.), the court should strike the one-year enhancement imposed pursuant to Penal Code section 667.5 subdivision (b), for a prior prison term.

In our prior unpublished opinion we affirmed defendant's convictions, struck the one-year prior prison term enhancement imposed pursuant to Penal Code section 667.5, subdivision (b), and remanded in light of Senate Bill No. 1393 (2017-2018 Reg. Sess.) to permit the trial court to consider whether to strike or dismiss defendant's prior serious felony conviction. The California Supreme Court granted review and ordered briefing deferred pending its decision in *People v. Lemcke* (2021) 11 Cal.5th 644 (*Lemcke*).

After the California Supreme Court issued its decision in *Lemcke*, it transferred this matter back to us with directions to vacate our decision and reconsider the cause in light of *Lemcke*. We conclude *Lemcke* does not change the result and reissue our prior opinion affirming the judgment, with modest revisions.

## FACTUAL AND PROCEDURAL BACKGROUND

An information charged defendant with carjacking and robbery. (Pen. Code, §§ 215, subd. (a), 211.)[2] The information also alleged defendant personally used a dangerous or deadly weapon, a pellet gun, in the commission of the crimes (§ 12022, subd. (b)(1)) and defendant suffered a prior strike, based on a 1999 robbery (§§ 667, subd. (d), 1170.12, subd. (b)). Allegations pursuant to section 667, subdivision (a), and section 667.5, subdivision (b), were also alleged.

---

[2]     All undesignated statutory references are to the Penal Code.

A jury trial followed. The following evidence was introduced at trial.

**The Incident**

One morning in April 2016 Ronnie Rogers, a petroleum salesman, visited one of his accounts, Green Rider Oil Change. Rogers went into the shop to speak with the owner, Victor Lu.

As the pair spoke, an African-American male, later identified as defendant, walked into the shop. Rogers stood a few feet away. Defendant held a firearm in each hand. One was black and they appeared real.

Defendant banged the guns together and they made a sound that Lu believed was the sound of metal. Defendant told Rogers and Lu to give him their keys. Rogers complied immediately; Lu complied at Rogers's urging. Rogers then turned and ran out of the oil change shop, hopped over a fence, and into a neighboring bank.

**911 Call**

Rogers asked a bank security guard to call 911. The guard called at 9:27 a.m. Rogers told the 911 operator that the intruder was African-American, between five foot seven and five foot eight inches tall, 22 to 25 years old, with short hair. He wore dark clothing and carried a "back pack like a red back pack."

Rogers ran back to the oil change shop and saw defendant unlocking Rogers's truck. Rogers yelled that the police were on their way. Defendant took off in the truck; Rogers did not see anyone else around the truck.

Rogers called his wife. He had left his phone in the truck and his wife was able to track the truck's location through the phone. Rogers gave the 911 operator the location of the truck, which was parked about a mile away from the oil change shop. The truck was parked in front of a chain link fence.

### Response

A dispatch alerted Deputy Darren Anderson to the truck's location. Anderson saw the truck within approximately 10 minutes of the theft. Anderson watched the truck from a nearby corner while he waited for backup. He saw no one around the truck.

About 10 minutes later, when backup arrived, Anderson and two other deputies approached the truck. When they opened the truck door, officers found defendant curled in a ball on the driver's side floor. Defendant wore two T-shirts, one grey and one white. Over the t-shirts was a long-sleeve gray shirt with red stripes. Defendant wore dark colored pants and checkered or plaid boxer shorts.

### Items Recovered from Truck

In the front seat officers found a backpack containing defendant's California identification card, defendant's prescription medication, defendant's utility bill, and Rogers's wallet. The backpack also contained various tools: an adjustable wrench, a small screwdriver, a Swiss Army knife, pliers, snips, a file, and a lug nut tool.

The officers also found a pair of glasses with no lenses matching those described by Rogers. They found a brown hat on the driver's seat. Lu identified it as similar to the hat worn by the perpetrator.

The truck also contained two sets of keys and two guns. Under the dashboard was a silver and black handgun, later determined to be an airsoft BB gun. Officers also found a black airsoft BB gun. Rogers identified the guns as those used in the robbery. The guns yielded no usable fingerprints.

### Identifications

Prior to conducting field showups, officers interviewed Lu and Rodgers. Lu told a deputy that the robber's pants were baggy and he wore boxer shorts with a blue, black, and white pattern.

4

A deputy took Rogers for a field showup. Rogers identified defendant as the robber, recognizing his face and his red shirt. Rogers stated he was 100 percent certain defendant was the robber.

Lu also participated in a field showup. During the robbery, Lu said, he focused on the gun not the robber's face. Lu could not identify defendant, but stated he wore the same clothing as the robber. Lu recognized the boxer shorts and belt buckle defendant wore.

At trial, Lu identified a photograph of defendant's clothing as looking similar to the pattern on the robber's boxer shorts. Lu stated he did not believe there was enough time between the robbery and the field showup for the robber to have changed underwear. Lu testified the robber had a backpack, wore a grayish black hat, and wore glasses without lenses.

**Defense**

Defendant presented testimony by Dr. Geoffrey Loftus, an expert on human perception and memory. Dr. Loftus testified regarding the effects of the aftermath of the crime on a witness's recollection of the crime itself. He also discussed the correlation between the duration of an event and one's memory of it and cross-racial identification. According to Dr. Loftus, stress and the presence of a weapon can reduce the accuracy of an eyewitness's identification. An eyewitness's confidence in an identification's accuracy does not necessarily correlate with the actual accuracy of the identification. In addition, field showups are intrinsically unreliable.

Defendant testified in his own defense. He was homeless. The day of the robbery, he was walking to a smoke shop when an acquaintance named Smitty pulled up in a pick-up truck. Smitty, also homeless, said he borrowed the truck from a friend's uncle.

5

Smitty asked if defendant had any drugs. Defendant said he had marijuana and methamphetamine. Smitty told defendant to get in the truck and he would get money for the drugs. The duo took several hits of methamphetamine.

Smitty drove to a cul-de-sac and, after he parked, told defendant he was going to get money from a house across the street. He left the keys to the truck inside.

As defendant waited in the truck, he saw a patrol car go by with its siren on. Afraid of being caught with drugs in the truck, defendant slid to the floor in front of the driver's seat and hid. Defendant did not touch the guns retrieved from the truck, nor had he ever seen Rogers or Lu prior to the field showups.

At the time of trial, defendant was 39 years old. He suffered felony convictions for crimes of moral turpitude in 1999, 2003, 2007, and 2011.

Deputy Anderson testified that the homeless often refer to one another by street names and know one another only through drug use. They also carry important paperwork with them.

**Verdict and Sentencing**

The jury convicted defendant on both counts. The jury found the armed with a weapon allegation to be untrue as to the carjacking offense.

Trial on the special allegations was bifurcated. Following a separate trial, the jury found defendant's 1999 robbery conviction qualified as a strike. The jury found the section 667, subdivision (a), allegation and the section 667.5 subdivision (b), allegation true.

The court sentenced defendant to: 18 years for count one, the upper nine-year term doubled based on the strike; plus two years for count two, one third the middle term, doubled for the strike; five years for the section 667, subdivision (a), allegation; and one year for the section 667.5, subdivision (b), allegation. Defendant filed a timely notice of appeal.

6

## DISCUSSION

## I

### *Exclusion of Expert Testimony*

Defendant argues the court denied him a fair trial when it precluded his expert, Dr. Loftus, from testifying about false identifications in cases where DNA evidence exonerates a defendant.

**Background**

Prior to Dr. Loftus's testimony, the court requested an offer of proof regarding the proposed testimony. The defense stated, among other things, Dr. Loftus would testify about statistical research on false identifications. Specifically, research revealing that witnesses made false positive identifications in 70 percent of cases where a defendant is exonerated by DNA evidence.

The court excluded Dr. Loftus's testimony on statistical studies, determining the evidence was irrelevant. The court also found the evidence inadmissible under Evidence Code section 352, as more prejudicial than probative.

The court stated it, as well as the greater legal community, was familiar with Dr. Loftus's work. Dr. Loftus's studies revealed the fallibility of eyewitness identification and supplied part of the basis for the jury instruction on the factors a jury should consider in determining the reliability of an eyewitness identification. These factors, the court observed, are relevant for law enforcement to improve their procedures and to inform juries about what is proper for them to consider in deliberations.

However, the court found: "It is exactly the prosecutor fal[l]acy to present to this jury that a percentage of eyewitness identifications are incorrect, whether they are incorrect, shown to be incorrect because of further scientific studies, or DNA exonerations, or recantations is not relevant. The fact that we could go into the specifics of what those false identifications entailed, such as whether it was a lineup, whether there

7

were two identifications identifying witnesses, whether there [was] voice ID, or asking a suspect to [ ]dress as the true criminal, simply takes us down a [section] 352 road of giving the jury more information about the reliability in those other cases, and I would exclude Dr. Loftus's testimony as irrelevant, and even if not irrelevant, that it is so potentially confusing and misleading to the jury that its prejudicial effect far outweighs its probative value.

"The comparison to DUI analysis is inept because that reverse extrapolation, I think they call it, has to do with an expert identifying a margin of error in the science. Dr. Loftus certainly can and properly should present to this jury factors of identification, and the Cal Crim instruction is a good template for that examination, but he will not be permitted to testify about the percentage of incorrect eyewitness identifications."

The court allowed Dr. Loftus to testify as to other factors affecting identification. Dr. Loftus testified that duration, distance, lighting, the witness's attention, focus on a weapon, and stress can affect a witness's memory and identification. Dr. Loftus further testified on cross-racial identification and the relationship between a witness's confidence in the identification and the accuracy of that identification.

**Discussion**

A person with special knowledge, skill, experience, training, or education in a particular field may qualify as an expert witness at trial. (Evid. Code, § 720.) However, an expert may offer his or her opinion only if it is related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact. (Evid. Code, § 801, subd. (a).)

The trial court possesses wide discretion to admit or exclude expert testimony. (*People v. Curl* (2009) 46 Cal.4th 339, 359.) We will not reverse the trial court's ruling on expert testimony unless we find a manifest abuse of discretion. (*People v. Lee* (2011) 51 Cal.4th 620, 643.)

8

In addition, a trial court may exclude relevant evidence if its probative value is substantially outweighed by the probability that the admission will necessitate undue consumption of time or create a substantial danger of undue prejudice, confusing the issues, or misleading the jury. (Evid. Code, § 352.) On appeal, we presume the trial court's evidentiary ruling is correct and the defendant bears the burden of demonstrating error. (*People v. Giordano* (2007) 42 Cal.4th 644, 666.)

Here, the trial court considered defendant's request to allow Dr. Loftus to testify concerning evidence of false identifications in 70 percent of cases where a defendant has been exonerated of a crime based on DNA evidence. The court found such testimony irrelevant to defendant's case. In addition, the court determined that any possible relevance of such testimony would be outweighed by the time required to explain the evidence and the evidence's penchant to confuse the jury.

Defendant disagrees, citing *People v. McDonald* (1984) 37 Cal.3d 351 (*McDonald*). In *McDonald*, a defendant was charged with shooting a victim during a robbery. No circumstantial evidence linked the defendant to the crime. Seven witnesses who saw the crime from varying distances provided equivocal identifications of the defendant as the assailant. (*Id.* at pp. 355-358.) The defendant presented testimony by several witnesses who stated he was in another city the day of the killing and supported their testimony with postcards and phone bills. (*Id.* at p. 360.)

The Supreme Court reversed the defendant's murder conviction, citing the trial court's exclusion of expert testimony at trial. The defense expert would have informed "the jury of various psychological factors that may affect the reliability of eyewitness identification and to 'help to counter some common misconceptions' about the process." (*McDonald, supra*, 37 Cal.3d at p. 361.) Among the factors the defense expert would have testified to were: "[T]he observer's state of mind, his expectations, his focus of attention at the time, the suddenness of the incident, the stressfulness of the situation, and the differences in the race and/or age of the observer and the observed." (*Ibid.*)

9

In contrast to *McDonald*, the trial court in the present case allowed Dr. Loftus to testify about the various factors affecting memory and identification. The court carefully considered the proffered testimony about Dr. Loftus's specific studies and determined they were not relevant and more prejudicial than probative. We find no error.

Defendant also contends the prosecution opened the door to admit Dr. Loftus's testimony regarding false identification during cross-examination.

During direct examination, Dr. Loftus testified that field showups are inherently unreliable. During cross-examination the prosecutor asked:

"Q: And your testimony is that in field show-ups are unreliable?

"A: Yeah.

"Q: And, but in-field show-ups are used every day in law enforcement agencies in California, you know that?

"A: They sure are."

Defense counsel objected, arguing the prosecution had opened the door to admit testimony by Dr. Loftus regarding false identification testimony by insinuating that field showups are reliable since they are used regularly. Defense counsel wanted to question Dr. Loftus as to the reason he believed such identifications are unreliable and the scientific basis for that belief. The court denied the request, stating it would mislead the jury.

Defendant argues the trial court's ruling "was an abuse of discretion and patently absurd." We disagree. The trial court simply exercised its discretion under Evidence Code section 352 to weigh the prejudicial effect of the proffered evidence against its probative value.[3]

---

[3]     Defendant also claims the court's exclusion of Dr. Loftus's testimony on false identification violated his constitutional right to present a defense. However, when

" 'We review the trial court's ultimate ruling for an abuse of discretion [citations], reversing only if " 'the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " [Citation.]' [Citation.]" (*People v. Jackson* (2016) 1 Cal.5th 269, 321.) Here, defendant was permitted to introduce some but not all of the testimony he wished to offer on the accuracy of field showups. The trial court did not abuse its discretion.

## II

### *Instructional Error*

**Background**

The court instructed the jury utilizing CALCRIM No. 315:

"You've heard eyewitness testimony identifying Mr. Jenkins. As with any other witness, you must decide whether an eyewitness gave truthful and accurate testimony.

"In evaluating identification testimony, consider the following questions:

"Did the witness know or have contact with Mr. Jenkins before the event?

"How well could the witness see the perpetrator?

"What were the circumstances affecting the witness's ability to observe, such as lighting, weather conditions, obstructions, distance, and duration of observation?

"How closely was the witness paying attention?

"Was the witness under stress when he made the observation?

"Did the witness give a description, and how does that description compare to Mr. Jenkins?

"How much time passed between the event and the time when the witness identified Mr. Jenkins?

"Was the witness asked to pick the perpetrator out of a group?

---

evidence is properly excluded under Evidence Code section 352 the defendant's constitutional rights are not violated. (*People v. Mills* (2010) 48 Cal.4th 158, 196.)

"Did the witness ever fail to identify Mr. Jenkins?

"Did the witness ever change his mind about the identification?

"How certain was the witness when he made the identification?

"Are the witness and Mr. Jenkins of different races?

"Was the witness able to identify Mr. Jenkins in a photographic or physical lineup?

"Are there other factors relevant to eyewitness identification?

"The People have the burden of proving beyond a reasonable doubt that it was Mr. Jenkins who committed the crime.  If the People have not met this burden, you must find Mr. Jenkins not guilty."

The jurors were also instructed that "[p]eople sometimes honestly . . . make mistakes about what they remember" and the jurors were responsible for "judg[ing] the credibility or believability of the witnesses."

**Discussion**

We concluded in our prior opinion that instructing the jury with the standard CALCRIM No. 315 instruction did not violate defendant's due process rights; our Supreme Court had rejected a similar challenge to a similarly worded instruction in *People v. Ward* (2005) 36 Cal.4th 186.  We also rejected defendant's claim of ineffective assistance of counsel for failing to object to CALCRIM No. 315, because—in light of *People v. Ward*—counsel had a valid tactical reason for not objecting.  (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266.)

The California Supreme Court subsequently granted review and later transferred this matter back to us with directions to vacate our prior opinion and reconsider the cause in light of its decision in *Lemcke*, which involved a similar challenge to CALCRIM No. 315.

12

In *Lemcke*, our Supreme Court rejected a claim that CALCRIM No. 315's instruction that the jury "consider an eyewitness's level of certainty when evaluating an identification" violated a defendant's due process rights. (*Lemcke*, *supra*, 11 Cal.5th at pp. 646-647, 653-661.) But recognizing the instruction has "the potential to mislead jurors," given the "near unanimity in the empirical research that ' "under most circumstances, witness confidence or certainty is not a good indicator of identification accuracy," ' " (*id.* at p. 665) the court exercised its supervisory powers to direct trial courts to omit the certainty factor from CALCRIM No. 315 (unless the defendant requests otherwise), pending reevaluation of the factor by the Judicial Council. (*Lemcke, supra*, at pp. 647-648, 669.)

Following transfer the parties filed supplemental briefs. In supplemental briefing, defendant argues "the certainty instruction misled and confused the jury," and "[t]he circumstances in *Lemcke* are distinguishable from this case." Defendant emphasizes that the trial court here "limited the testimony of the expert about the unreliability of in-field show-ups," thereby "markedly curtail[ing] the defense from fully challenging Rogers'[s] ability to make an accurate identification."

The People argue *Lemcke* does not change the result in this case, as there was no due process violation.

Defendant did not object to this instruction at trial. "Failure to object to instructional error forfeits the issue on appeal unless the error affects defendant's substantial rights. [Citations.] The question is whether the error resulted in a miscarriage of justice under *People v. Watson* (1956) 46 Cal.2d 818." (*People v. Anderson* (2007) 152 Cal.App.4th 919, 927.)

We conclude there was no miscarriage of justice, because "listing the witness's level of certainty as one of 15 factors the jury should consider when evaluating eyewitness identification did not render [defendant's] trial fundamentally unfair or otherwise amount to a due process violation." (*Lemcke, supra*, 11 Cal.5th at p. 661.)

13

As the court held in *Lemcke*, the challenged portion of the instruction does not expressly equate certainty with accuracy. (*Lemcke, supra*, 11 Cal.5th at p. 657.) Even if the instruction were susceptible to such an interpretation, defendant—like the defendant in *Lemcke*—presented expert testimony challenging that interpretation. (*Id*. at pp. 657-658.) That the trial court may have limited the expert's testimony about the unreliability of field showups does not clearly diminish a key similarity between this case and *Lemcke*: expert witness testimony attacked the evidentiary value of eyewitness identification of defendant. (See *id.* at p. 647 ["We reject [defendant's] due process claims. . . . Although the language [of CALCRIM No. 315] may prompt jurors to conclude that a confident identification is more likely to be accurate, [defendant] was permitted to call an . . . expert who explained the limited circumstances when certainty and accuracy are positively correlated"].)

Moreover, the jury instructions as a whole made clear that the challenged portion of CALCRIM No. 315 did not lower the prosecution's burden of proof. (*Lemcke, supra*, 11 Cal.5th at p. 658.) As in *Lemcke*: "[T]he instruction on eyewitness identification evidence reiterated that . . . with respect to [defendant's] identity" the prosecution had the burden of proving beyond a reasonable doubt that it was defendant who committed the crimes (*ibid.*); the jury here was instructed that "[p]eople sometimes honestly . . . make mistakes about what they remember" and that the jurors were responsible for "judg[ing] the credibility or believability of the witnesses" (*ibid.*); and, defendant had a full and fair opportunity to cross-examine the victims regarding their identifications. (*Id*. at p. 660.) Under these circumstances, the certainty instruction did not violate defendant's due process rights or otherwise render his trial fundamentally unfair. (*Id*. at p. 661.)

While we agree with defendant that the instant case differs from *Lemcke* in some respects, those differences do not favor defendant's effort to obtain a reversal of his convictions. In *Lemcke*, "the conviction was based almost entirely on the testimony of a [1] *single* witness who [2] expressed certainty in her identification and [3] had no prior

14

relationship with the defendant." (*Lemcke*, *supra*, 11 Cal.5th at p. 666, italics added.) That scenario was "particular[ly] concern[ing]" to our Supreme Court, because the challenged instruction "d[id] nothing to disabuse jurors of the common misconception" that "a certain identification is more likely to be accurate." (*Ibid.*) Here, by contrast, defendant's convictions were based on the testimony of *two* witnesses, one of whom did *not* identify defendant, but stated he wore the same underwear as the robber. This is a less concerning scenario than the one in *Lemcke*.

## III

### *Exclusion of Evidence*

Defendant challenges the court's exclusion of evidence of his statement to officers regarding Smitty. The court's ruling, defendant argues, deprived him of the right to present a defense.

**Background**

During trial, the prosecutor moved to preclude defense counsel from introducing defendant's testimony that he told officers that Smitty drove the truck. The prosecutor argued defendant's statement was hearsay and inadmissible under Evidence Code sections 791, 1220, or 1236.

Defense counsel sought to ask Deputy Anderson whether there was another suspect involved in the investigation. He explained that he was not seeking the answer for the truth of the matter, "but rather for the effect on the listener. What the officer did, how he responded, the fact he wasn't aware of that, then that effect wouldn't be there if he was never told, then I don't know if it would be calling for hearsay if he was never told." The court explained that it "sustained the objection on the basis [of] the officer's state of mind, what he looked for or didn't look for is not relevant. What's relevant is what he did, not what his motivation was, not what his state of mind was . . . his state of mind is not relevant."

15

During closing argument, the prosecutor argued that Smitty was imaginary and there was no evidence of his existence besides defendant's testimony. Defense counsel objected, arguing defendant's testimony was supported by defendant's statement to officers. The prosecutor, defense counsel asserted, opened the door to evidence of Smitty's existence beyond defendant's own words and that his statement to officers should be admitted. The court denied the request.

**Discussion**

Though the trial court seemed to premise its ruling on the state of mind exception to the hearsay ruling, it is not clear that defendant sought to bring his questioning within that exception and, on appeal, he expressly eschews any such intent. According to defendant, "Nobody argued that the statement was admissible as a state of mind exception to the hearsay rule under Evidence Code 1250, except respondent." On this point we concur with both parties that the state of mind exception does not apply. Defendant argues instead that the statement was not hearsay at all. It was not offered for the truth of the matter but "for the effect on the listener, what the officer did, how he responded."

Not quite. Defendant seeks to use his hearsay statement to show the officers engaged in no investigation regarding Smitty and that, therefore, their investigation was insufficient. According to defendant, defendant's statement was needed to "show how the investigation unfolded, and to show that the police failed to look for the other man. Without this evidence, the jury was left to wonder why, if defendant's testimony was true, why he did not tell the police immediately. Moreover, because this evidence was not admitted, the defendant was unable to show that the police investigation was shoddy."

But defendant's statement about Smitty does not *explain why* the officers did no investigation regarding Smitty, and thus it is not admissible for the purpose of showing

16

the officers' conduct after hearing defendant's statement. As for the prosecutor purportedly opening the door by arguing Smitty was a fictitious person, admitting defendant's statement to the officers for the purpose of showing that they did no investigation regarding Smitty does not rebut that argument made by the prosecutor. As for showing the investigation was shoddy or incomplete because the officers did not investigate, this would only be the case if defendant's statement was true and Smitty actually existed. Thus, if admitted to show the police investigation was deficient, the statement must be taken for the truth of what was asserted therein for the statement to have relevance. The trial court did not abuse its discretion in determining the evidence was not relevant. Were it relevant for the reasons suggested by defendant it would be inadmissible hearsay.

Nor was defendant's statement to the police regarding Smitty admissible under Evidence Code section 791 as a prior consistent statement, the alternative grounds asserted by defendant. Evidence Code section 791 permits the admission of a prior consistent statement made before an asserted motive for fabrication has arisen. Case law, cited by defendant, recognizes there can be multiple motives to fabricate, and a statement made when there is an initial motive to fabricate may nonetheless be admissible as a consistent statement with respect to a later statement attributable to a separate and unrelated motive to fabricate. (*People v. Jones* (2003) 30 Cal.4th 1084.) Defendant's efforts to bring his case within this principle is to no avail. He makes the remarkable claim that "If appellant was telling the truth, he had no motive to lie when he was first detained." To the contrary, he had every motive to lie when found curled in a ball on the floor of a stolen truck. The same motive persisted throughout the criminal trial. The trial court did not err.

17

# IV

## *Prosecutorial Misconduct*

In a related argument, defendant contends the prosecutor committed misconduct during rebuttal argument when he stated there was no evidence other than defendant's own testimony as to the existence of an "imaginary Smitty." The statement was improper based on the trial court's exclusion of evidence that defendant told sheriff's deputies about Smitty when they found him in the stolen pick-up. This misconduct deprived defendant of a fair trial.

### Background

During rebuttal closing argument, the prosecutor argued defendant lied when he testified Smitty committed the crimes. The prosecutor showed a Power Point slide entitled "Imaginary Smitty" purporting to summarize the deficiencies in the evidence, which included the line: "Any evidence that Smitty carjacked and robbed besides Jenkins['s] own statement? No."

The prosecutor argued: "So let's talk about his testimony. Sounds like an imaginary Smitty to me. Does he have a first name for Mr. Smitty? No. Last name for Smitty? No. An address for Mr. Smitty? No. any way to contact Mr. Smitty? No. Smitty wear the glasses with no lenses found on the driver's seat? No. Did he wear the hat that was found on the driver's seat that was -- the person that carjacked had robbed these two victims had on? No. What was he wearing that day? I don't know, just some dark clothing. How about the back pack? He says bag first, then says backpack. Well, he said it was first red, and then I said are you sure of that? Then he says black. Then he said, 'oh, red and black.' That's really how you know when someone is lying, when they go red, black, okay, red and black. It's pretty ridiculous his story. Was Smitty wearing a similar shirt to him? No. Was he wearing checkerboard blue, black and white underwear?"

18

Defense counsel objected that the prosecutor had misstated the testimony. The court overruled the objection and instructed the jury that they were to judge the evidence presented.

The prosecutor then argued: "So he doesn't know what Smitty was wearing. Any evidence that Smitty carjacked and robbed besides Mr. Jenkins' own self-serving statement? Is there anything you can hang your hat on to say, yeah, I think he's -- yeah. No, no, no. Nothing."

After the jury began deliberations, defense counsel objected that the slide and argument were both improper. Defendant's testimony was supported by his prior statement to officers, which the trial court excluded. In addition, defense counsel argued the prosecutor's argument opened the door to allowing defendant's statement to officers into evidence.

The trial court responded: "[M]y radar kind of went up about it because we had talked at length about it, but [the prosecutor's] argument was that story was bogus, whether it was told from the stand of at the scene. He was not saying it had been recently fabricated, and the recent fabrication is the thing that makes a prior statement admissible." The prosecutor explained his comments: "What I was implying, there's nothing to support what [defendant] said, not that when I say other evidence I meant, other evidence besides what comes out of his mouth. And the statement prior [to officers at the time he was apprehended] came out of his mouth. It's not like it was some other evidence that the Court excluded."

Defense counsel asked to reopen his case and introduce evidence that defendant told a deputy about Smitty after defendant was apprehended. The trial court denied the request.

**Discussion**

A prosecutor's conduct violates the federal Constitution when it comprises a pattern of conduct so egregious that it infects the trial with such unfairness as to deny a defendant due process. Prosecutorial conduct that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury. (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 427 (*Bryant*); *People v. Samayoa* (1997) 15 Cal.4th 795, 841.) It is misconduct for a prosecutor to misstate the law during argument, misstate or mischaracterize the evidence, or assert facts not in evidence. (*People v. Whalen* (2013) 56 Cal.4th 1, 77; *People v. Davis* (2005) 36 Cal.4th 510, 550; *People v. Cunningham* (2001) 25 Cal.4th 926, 1026.)

When prosecutorial misconduct is based on the prosecution's comments in front of the jury, we consider whether there is a reasonable likelihood the jury construed or applied any of the complained-of remarks in an objectionable fashion. (*Bryant, supra*, 60 Cal.4th at p. 427.) We review the challenged statements within the context of the record and argument as a whole. (*People v. Cole* (2004) 33 Cal.4th 1158, 1203.) In addition, we do not lightly infer that the jury drew the most, rather than the least, damaging meaning from the prosecution's statements. (*People v. Shazier* (2014) 60 Cal.4th 109, 144.)

Our review of the record reveals no prosecutorial misconduct. The prosecutor argued defendant's testimony about Smitty was not credible. The prosecutor did not argue that defendant never told the deputies about Smitty. The prosecutor did not, as defendant claims, imply "that [defendant's] trial testimony was recently fabricated, which he knew was not true." Nothing in the prosecution's comments supports this assertion. We find no misconduct.

20

# V

## *Supplemental Briefing*

In supplemental briefing, defendant contends, in light of the passage of Senate Bill No. 1393 (2017-2018 Reg. Sess.), which became effective after sentencing, that this matter must be remanded to permit the trial court to consider whether it should exercise the discretion afforded by Senate Bill No. 1393 to strike or dismiss the prior serious felony conviction enhancement imposed under section 667, subdivision (a)(1). (Stats. 2018, ch. 1013, §§ 1-2.) The People concede defendant is entitled to the benefit of Senate Bill No. 1393 but assert remand is unwarranted in light of defendant's extensive criminal history and the trial court's denial of defendant's motion to strike defendant's strike prior. These circumstances suggest that the trial court would not exercise its discretion to strike the enhancement, but we are compelled to remand absent a clear indication that it would not. (See *People v. Billingsley* (2018) 22 Cal.App.5th 1076, 1081.) Lacking such a clear indication we shall remand and permit the trial court to decide.

Finally, defendant contends the court should strike the one-year enhancement imposed pursuant to section 667.5 subdivision (b), for a prior prison term. Though proper at the time of defendant's sentencing, Senate Bill No. 136 (2019-2020 Reg. Sess.) was thereafter enacted to require that the prior prison term be served "for a sexually violent offense as defined in subdivision (b) of Section 6600 of the Welfare and Institutions Code." (Stats. 2019, ch. 590, § 1.) The People acknowledge that the amendment applies retroactively to defendant and requires that the prior prison term enhancement be stricken because his prior conviction does not qualify as a sexually violent offense.

## DISPOSITION

The matter is remanded to the trial court for resentencing. The prior prison term enhancement imposed pursuant to section 667.5, subdivision (b) is stricken. The trial court shall consider whether to strike or dismiss defendant's prior serious felony conviction and to exercise whatever additional sentencing discretion is available to it. The trial court is directed to prepare an amended abstract of judgment and forward a copy to the appropriate entities. In all other respects, the judgment is affirmed.


                                         /s/
                                    RAYE, P. J.


We concur:


       /s/
DUARTE, J.


       /s/
MURRAY, J.*

---

\*     Retired Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.